UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS N. HARRIS,

        Plaintiff,

v.

CINDI CURTIN, *et al.*,

        Defendants.

_____/

Case No. 1:05-CV-815

Hon. Hugh W. Brenneman, Jr.

**OPINION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The court granted defendants' motion for summary judgment on March 4, 2008. *See* docket no. 68. Plaintiff appealed the decision. *See* docket no. 69. On appeal, the Sixth Circuit affirmed in part, reversed in part, and remanded for further proceedings with respect to plaintiff's "claim three," which alleged that defendants Smith, Hogle, and Kemp violated his Eighth Amendment rights when he was sprayed with a chemical agent on August 10, 2004. *See Harris v. Curtin*, 08-1413 (6th Cir. Sept. 19, 2008); docket nos. 77 and 78. This matter is now before the court on defendants' motion for summary judgment (docket no. 123).

    **I.**    **The Sixth Circuit's opinion in *Harris v. Curtin***

The Sixth Circuit's decision is the law of the case which this court must follow on remand. *See United States v. Mendez*, 498 F.3d 423, 426 (6th Cir. 2007) ("Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation," while "[t]he mandate rule requires lower courts to adhere to the commands of a superior court.") (internal citations and quotation marks omitted). For this reason,

the court will address defendants' motion within the context of that opinion, which provided in pertinent part as follows:

> Harris alleges in claim three that the defendants sprayed him "severely" with a chemical agent without justification and used excessive force against him with disregard to the health risks posed to Harris, who suffers from asthma and previously had undergone surgery for a brain aneurysm. Harris argues that the defendants could have taken a different course of action and that there was no reason they needed to spray him. The evidence presented on this issue consisted of a critical incident report prepared by defendant Hogle, and sworn affidavits by defendant Smith and Harris.
>
> The critical incident report indicated that on August 10, 2004, Harris "received a misconduct for refusing to stop kicking on his cell door and for shattering his front door cell window." The report states that defendant Smith authorized the use of a forced cell entry and the use of chemical agents if necessary to remove Harris from his cell for a "shakedown" and the application of "full soft restraints" to prevent Harris from creating further cell destruction. Defendant Kemp was contacted, according to the incident report, and there was no known medical reason given for why chemical agents could not be used on Harris if necessary. Defendant Hogle ordered Harris to place his arms through the food slot so restraints could be placed. Because Harris allegedly refused, defendant Hogle administered "one short burst of chemical agents into Harris' cell." Harris then placed his arms through the slot and when an officer attempted to apply handcuffs, Harris "suddenly pulled on the restraints" and the response team of officers placed Harris in a wrist lock and regained control of Harris. Thereafter, Harris was taken to a shower, where he was strip searched and allowed to shower. Harris was later found lying on the shower floor, unresponsive. Although the critical incident report noted that a complete video recording of the incident existed, the video recording was never entered into evidence for reasons unknown to this court.
>
> Defendant Smith stated that he never authorized the use of chemical agents on Harris "to cause him death, brain injury, or any other health problem" and that, at all times, he acted in good faith. Both defendant Kemp and another nurse performed a medical check on Harris and, after taking his vital signs, noted no distress. They only found some slight swelling on Harris' left wrist and a small scrape on the ball of Harris' right foot.
>
> The district court found that Harris did not state "that he was complying with officers' orders." The record shows the contrary: admitting that he did break the window in his cell, Harris stated in his sworn affidavit that he had already "restrained any misbehavior" when the response team arrived at his cell. According to Harris, defendant Hogle stood in front of the cell window and told Harris that he was

2

> authorized to use chemical agents against Harris if he did not follow orders. Harris further stated that he was complying with orders to walk backwards to the cell door and to place his hands through the door slot when defendant Hogle sprayed him with the chemical agents through the top slot of the door. He also claimed that he "never resisted cuffing."

*Harris*, No. 08-1413, slip op. at 3-4. Based upon the statements in Harris' affidavit, the Sixth Circuit found a genuine issue of material fact as to whether the force used was excessive, and vacated the district court's order granting summary judgment on claim three. *Id.* at 5.

## II. Legal Standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

3

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Discussion

### A. Excessive Force

The Sixth Circuit's order of remand set forth the legal standard applicable to an Eighth Amendment excessive force claim:

> The Eighth Amendment "prohibits punishments that involve the unnecessary and wanton infliction of pain, including inflictions of pain that are totally without penological justification." *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)) (internal quotation marks omitted). "Where a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff . . . the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted); *see also Lockett*, 526 F.3d at 875 ("'good faith use of physical force may be necessary to maintain prison security and discipline'") (quoting *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992)).
>
> "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated," which is "true whether or not significant injury is evident." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). This does not mean that every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* "The Eighth Amendment's prohibition of 'cruel and unusual'

4

punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10 (internal quotation marks omitted).

*Harris*, No. 08-1413, slip op. at 3.

The Sixth Circuit's order remanding this case does not address the legal framework applicable to a cause of action arising from the alleged excessive use of a "chemical agent." Rather, the court apparently agreed that plaintiff's allegations that "the defendants sprayed him 'severely' with a chemical agent without justification and used excessive force against him with disregard to the health risks posed to [plaintiff], who suffers from asthma and previously had undergone surgery for a brain aneurysm" stated a cause of action under the Eighth Amendment. *Harris*, No. 08-1412, slip op. at 3. Accordingly, the court will apply the legal standard as set forth in this order pursuant to the law of the case doctrine and the mandate rule. *See Mendez*, 498 F.3d at 426.[1]

---

[1] The court notes that the use of chemical agents such as mace or tear gas does not constitute cruel and unusual punishment when reasonably necessary to subdue recalcitrant prisoners. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984); *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975). In *Caldwell v. Moore*, 968 F.2d 595 (6th Cir.1992), the Sixth Circuit recognized that the use of chemical agents may be necessary to maintain discipline in prisons:

> When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While experts who testified on behalf of the plaintiffs suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

*Id.* at 602 quoting *Soto*, 744 F.2d 1260 at 1257.

5

### B. Defendant Lt. Fred Hogle

For purposes of this motion for summary judgment, the court will accept as true the following facts as determined by the Sixth Circuit: Harris admitted breaking his cell window; Harris had "restrained any misbehavior" when the response team arrived at his cell; Hogle stood in front of the cell window and told Harris that he was authorized to use chemical agents against Harris if he did not follow orders; that Harris "never resisted cuffing;" and, that Harris was complying with orders to walk backwards to the cell door and to place his hands through the door slot when Hogle sprayed him with the chemical agents through the top slot of the door. *Harris*, No. 08-1413, slip op. at 3-5. These issues created a genuine issue of material fact as to whether excessive force was used. *Id.* at 5.

In addition, the court will accept as true the facts as set forth in plaintiff's affidavit filed in opposition to the motion for summary judgment, which provides in pertinent part as follows:

> 2. On August 10, 2004, I broke the window to the cell upon being upset regarding a missing money order. Defendant Hogle came to the cell and asked me if I would come out of the cell. I told him I would. Defendant Hogle responded saying "I know you're going to. I'm going to spray your ass." This occurred around 9:05 a.m.
>
> 3. To my knowledge, Defendants Smith and Kemp authorized Defendant Hogle and the response team to use chemical agents upon me around 9:30 a.m. that day.
>
> 4. Defendant Hogle approached my cell with the response team. He told me he had been authorized to use chemical agents upon me if I did not follow orders. I was told to turn around where I was standing and walk backwards toward the cell door. I followed those orders.
>
> 5. Once I had walked backwards to the cell door, Defendant Hogle sprayed chemical agents toward me and also inside the cell, releasing a large amount of chemical agents.

>       6.      After being sprayed with the chemical agents, I started suffocating, felt burning on my face and inside my throat, and had chest and stomach pains. I felt extremely dizzy almost to the point of unconsciousness and fell to my knees. Thereafter, I was told to stick my left arm through the top slot of the cell door with my back still facing the cell door. I followed those orders.
>
> \*     \*     \*
>
>       10.     Prior to August 10, 2004, I had been diagnosed with asthma and hypertension. As well, I had a brain aneurysm rupture on June 2, 2004. For this reason, on June 9, 2004, I underwent surgery to insert brain coils to relieve the pressure from the aneurysm.
>
>       11.     At the time of the incident I was using two oral inhalers every four hours for asthma -- Albuterol Ventolin and Intal. I was also prescribed Nimotop by a neuro specialist on June 9, 2004, shortly after the surgery, to keep the arteries in my brain from constricting resulting in the lack of blood flow in the brain.

Harris Aff. (docket no. 126-2).

In support of his motion, Lt. Hogle has submitted: the August 10, 2004 critical incident report; the August 23, 2004 major misconduct hearing report; a critical incident report from July 16, 2004; and three major misconduct hearing reports from 2004 (June 28th, July 16th and August 27th). However, these documents do not eliminate the genuine issue of material fact identified by the Sixth Circuit or presented in plaintiff's affidavits.

The August 10th critical incident report (docket no. 124-2), a document which the Sixth Circuit reviewed and found to be "defendants' version of the facts," is in conflict with plaintiff's affidavit. *Id.* at 5.

The August 23rd major misconduct hearing report found plaintiff guilty of two offenses on August 10th: disobeying a direct order (apparently from Officer Jaramillo) to stop kicking his door; and destruction of property (breaking the door window). *See* docket no. 124-3.

7

However, this major misconduct hearing report did not address plaintiff's alleged failure to obey orders that led to the alleged use of excessive force. *Id.*

The critical incident report from July 16th involved an earlier incident in which plaintiff placed his arms in the food slot, refused to move them, and was given a short burst of chemical agent without incident. *See* docket no. 128-3. While this report may be relevant evidence that plaintiff had a history of disobeying orders and experienced no adverse effect from the previous use of chemical agents, the report did not address the use of chemical agents alleged in this action, which occurred on August 10th. Similarly, while the major misconduct hearing reports from June 28th, July 16th and August 27th may be relevant to plaintiff's history of disobeying direct orders from correctional officers, none of them address the alleged excessive use of force at issue in this action. *See* docket no. 124-4.

The Sixth Circuit found that plaintiff's original affidavit created a genuine issue of material fact with respect to whether excessive force was used in removing plaintiff from his cell. Plaintiff's second affidavit raised additional factual issues, including Lt. Hogle's alleged threat, i.e., "I'm going to spray your ass." While Lt. Hogle has submitted documents relevant to plaintiff's history of disobeying orders and the absence of adverse effects from a previous use of chemical agents, genuine issues of fact remain surrounding the events that occurred on August 10, 2004. Accordingly, Lt. Hogle's motion for summary judgment should be denied.

### C. Nurse Kemp

Nurse Kemp's involvement in this action is her alleged act of authorizing Lt. Hogle's use of the chemical agent on plaintiff knowing that plaintiff suffered from asthma and a brain aneurysm and should not have been sprayed. *See* Compl. at 7-8 (docket no. 1). As the Sixth Circuit

stated, "Defendant Kemp was contacted, according to the incident report, and there was no known medical reason given for why chemical agents could not be used on Harris if necessary." *Harris*, slip op. at 4. In addition, Nurse Kemp examined plaintiff after he collapsed in the shower. *Id.* Plaintiff's medical records from the Michigan Department of Corrections (MDOC) indicate that on August 10, 2004, the health care department received a call from custody seeking authorization to use a chemical agent on plaintiff because the prisoner broke out his cell window, and staff may need to use force to move him to another cell. *See* docket no. 126-4. The records note "High risk for these actions due to aneurysm." *Id.*

Defendants have presented new evidence with respect to the risks and potential injuries caused by the chemical agents used by the MDOC. Haresh Pandya, M.D., a Regional Medical Officer for the MDOC stated: that plaintiff had pepper spray used on him in February 2004, July 16th, 2004 and August 10, 2004; that in his April 21, 2009 deposition, plaintiff claimed that his symptoms following the August 10th pepper spray included acid stomach, chest pain, and chest-stomach area swelling; that plaintiff went on pain medication for high blood pressure on June 10, 2004, and which is widely known to cause mild reflux symptoms; that his other symptoms are widely known to be caused by anxiety, worrying and aging; that anxiety and worrying about the diagnosis of an aneurysm of the brain artery and seizure disorders is natural; that none of the symptoms plaintiff described are known to be delayed effects of the use of pepper gas; and that in Dr. Pandya's opinion none of the symptoms claimed by plaintiff in his deposition were caused by the August 10th pepper gas incident. *See* docket no. 124-5.

In her affidavit, Health Unit Manager (HUM) Ann Karp stated: that at the time relevant to this action, Health Care employees assessed patients for use of chemical agents as high

9

risk for unwanted side effects, moderate risk for unwanted side effects, and normal risk for unwanted side effects; that the term "high risk" should be used when a patient has moderate to severe asthma, uncontrolled hypertension, moderate or severe heart disease, or chronic obstructive pulmonary disease (COPD); that the term "moderate risk" should be used when the patient has mild asthma, controlled hypertension, mild heart disease, or a past history of multiple drug allergy; and, that the term "normal risk" should be used when the patient does not meet the criteria for either of the other two categories. *See* docket no. 128-2. HUM Karp further stated that:

> Simply because an inmate is classified as "high risk" relative to the use of chemical agents does not preclude the use of such agents by correctional staff. A balancing test is used by correctional staff in determining whether the use of chemical agents outweighs other options - i.e., physical force - when removing one from a cell.

*Id.*

It is undisputed that plaintiff's aneurysm met the "high risk" classification for unwanted side effects from chemical agents. However, the fact that plaintiff was at "high risk" for unwanted side effects did not exclude him from the use of the chemical agent. HUM Karp's affidavit explained that the "high risk" classification did not preclude the use of chemical agents by correctional staff. In addition, Dr. Pandya's affidavit states that none of plaintiff's alleged symptoms were known to be the delayed side effects of the pepper spray used on plaintiff. Under these circumstances, Nurse Kemp's authorization of the chemical agent did not constitute malicious or sadistic behavior prohibited by the Eighth Amendment. *See Hudson*, 503 U.S. at 9,10. Accordingly, Nurse Kemp is entitled to summary judgment on this claim.

**D.     Warden Smith**

Plaintiff's claim against Warden Smith is similar to that alleged against Nurse Kemp, i.e., that he authorized the use of the chemical agent with full knowledge that plaintiff suffered from asthma and a brain aneurysm. Compl. at 7-8. The Sixth Circuit did not address plaintiff's claim against Warden Smith in any detail, simply noting that "Defendant Smith stated that he never authorized the use of chemical agents on Harris 'to cause him death, brain injury, or any other health problem' and that, at all times, he acted in good faith." *Harris*, No. 08-1413, slip op. at 4.

Warden Smith's deposition testimony established that he had no personal knowledge of plaintiff's medical condition. Warden Smith testified that either the warden or deputy warden authorizes the use of chemical agents on prisoners. Smith Dep. at 11-12 (docket no. 126-3).[2] He described the policy as follows. The shift commander makes the call to the warden after talking to the prisoner, instructing the prisoner to comply and assembling a response team. *Id.* at 12-13. If a prisoner is not going to comply, then the policy directives require the warden to use chemical agents before using force. *Id.* at 18. Chemical agents are used "fairly often" when prisoner do not comply with a direct order. *Id.* at 19.

Warden Smith had no independent recollection of the August 10th incident. *Id.* at 11. The warden was not familiar with plaintiff, had never reviewed plaintiff's medical file, was not directly involved in plaintiff's health care, and was not aware that plaintiff had a brain aneurysm two months prior to the use of the chemical agents. *Id.* at 14, 29. While the warden agreed that it would be important to know whether an inmate had asthma before using chemical agents, he was not aware

---

[2] Plaintiff is the only party to submit a complete copy of Warden Smith's deposition. For this reason, citations to the Warden's deposition will be from that exhibit, docket no. 126-3.

11

that plaintiff suffered from that condition. *Id.* at 14-15. Any information he received on a prisoner came from the health care unit or health care bureau. *Id.* at 29. In an affidavit filed previously in this action, Warden Smith explained that he has no knowledge of matters contained in a prisoner's medical record. Smith Aff. (docket no. 53-11). The warden relies on the health care staff to address the medical ramifications of using chemical agents. "Because of the confidentiality of medical records, custody staff inform health care staff before chemical agents are used, and health care staff review the prisoner's medical records and inform custody staff of the relative risks of using chemical agents on a particular person." *Id.* at ¶ 7.

Warden Smith was aware of the three medical risk levels associated with the use of chemical agents, noting that a "high risk" means that the prisoner "may have [a] reaction to chemical agents." Smith Dep. at 29. However, a "high risk" classification did not prohibit the use of chemical agents. *Id.* His knowledge about the risks from using chemical agents came from the prison's health care unit. *Id.* at 30. Finally, Warden Smith did not know of any specific medical condition that would prohibit the use of the agents. *Id.* at 15, 29.

There is no evidence that Warden Smith knew plaintiff or had any knowledge of plaintiff's medical condition. Once the warden authorized the use of chemical agents, the health care staff reviewed plaintiff's medical file and determined the relative risks for using chemical agents. Plaintiff has presented no evidence that the warden acted maliciously or sadistically in authorizing the use of the chemical agent on August 10, 2004. *See Hudson*, 503 U.S. at 9,10. Accordingly, Warden Smith is entitled to summary judgment on this claim.

## IV. Conclusion

Accordingly, defendants' motion for summary judgment (docket no. 123) will be **GRANTED** as to plaintiff's claim against defendants Willie Smith and Nurse Kemp, and **DENIED** as to plaintiff's claim against defendant Lt. Fred Hogle. An order consistent with this opinion shall be issued forthwith.


Dated: August 14, 2009               /s/ Hugh W. Brenneman, Jr.
                                     HUGH W. BRENNEMAN, JR.
                                     United States Magistrate Judge